

1   Marilou: Samson, Authorized Agent, Trustee
2   2574 31st Avenue, Non-Domestic
    San Francisco, California [94116]
3   Plaintiff, In Pro per
    415-902-4910

4

5                                   

6

7

8                        UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11

12  MARILOU SAMSON                      CASE NO. 1 0    A 8 2 7
            Plaintiff,
13

14  vs.                                 **COMPLAINT UNDER SECURITIES**

15  ONE WEST BANK, AURORA LOAN          **EXCHANGE ACT OF 1934-**
    SERVICES, L.L.C., JP MORGAN CHASE,
16  INDYMAC MORTGAGE SERVICES           **CHURNING OF ACCOUNT AND**
    EVERGREEN LENDING, INC. and
17  MORTGAGE ELECTRONIC                 **RELATED COUNTS**
    REGISTRATIONS SYSTEM, M.E.R.S.
18                                      **JURY DEMAND**
            Defendant(s).
19

20

21  Plaintiff alleges:

22                              **PARTIES**

23  1.  At all relevant times, plaintiff was and still is a resident of California.

24  2.  Plaintiff is informed and believes, and on that basis alleges that, at all relevant times,

25      defendant(s) ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN

26      CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC.

27      and M.E.R.S. were corporation(s) organized and operating under the laws of the State of

28      California, was duly licensed to engage in the business of securities broker, securities

    COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

                                      1

broker, securities dealer, and investment adviser, and was a member firm of the National Stock Exchange Inc., and the National Stock Exchange Inc., subject to their respective Constitutions and Rules, as well as a member of the Securities Exchange Commission subject to its Rules.

3. Plaintiff is informed and believes, and on that basis alleges that, at all relevant time's defendant(s) ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. were registered representative(s), engaged in business as a securities salesperson, and an officer(s) and employee(s) of ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S.

4. At all relevant times defendant(s) ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. were a Mortgage Lender and Mortgage Servicer, duly authorized to conduct business in the State of California duly licensed to engage in the business of securities broker and securities dealer, and was a member firm of the National Stock Exchange, Inc., the National Stock Exchange, Inc., subject to their respective Constitutions and Rules, as well as a member of the Securities Exchange Commission, subject to its Rules.

5. All of the defendants maintained their offices for the transactions of their business at: within the territorial confines of the United States District of California and United States.

6. At all relevant times, defendant's officers and directors acted as clearing agent for defendant(s) ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. transactions for MARILOU SAMSON, a customer.

## JURISDICTION

7. This action arises under the *Securities Act of 1933* and the *Securities Exchange Act of 1934*, as amended, and *Rules 10b-5* of the General Rules and Regulations promulgated by the *Securities and Exchange Commission, Rule 12(2)* of the Rules of the *National Stock Exchange, Inc., Rule 20(a)* of the Rules of the National Stock Exchange, so that this court has jurisdiction over the matter under *15 U.S.C. §§ 77v, 78aa* and *28 U.S.C. § 1331* as well as the principles of supplemental jurisdiction.

8. The Trustee brings this action pursuant to the authority conferred by *Section 21(d)* of the Exchange Act *15 U.S.C. §78u(d)* seeking to restrain and enjoin permanently ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. from violating Section 14(a) of the Exchange Act *15 U.S.C. § 78n(a)* and *Rule 14a-9* thereunder *17 C.F.R. §240.14a-9*. The Trustee also seeks a final judgment ordering ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. to pay a civil money penalty pursuant to *Section 21(d) (3)* of the Exchange Act *15 U.S.C. §78u (d) (3)* and such equitable and other relief that may be appropriate or necessary for the benefit of investors *15 U.S.C. §78u (d) (5)*.

## HISTORY ON SECURITIZATION

9. The traditional mortgage model involved a bank originating a loan to borrower/homeowner and retaining the credit (default) risk. With the advent of securitization, the traditional model has given way to the "originate to distribute" model, in which banks essentially sell the mortgages and distribute credit risk to investors through mortgage-backed securities. Securitization meant that those issuing mortgages were no longer required to hold them to maturity. By selling the mortgages to investors, the originating banks replenished their funds, enabling them to issue more loans and generating transactions fees. This created a moral hazard in which and increased focus on processing mortgage transactions was incentivized but ensuring their credit quality was not. (1),(2)

10. Securitization accelerated in the mid-1990. The total amount of mortgage-backed securities issued almost tripled between 1996 and 2007, to $7.3 trillion. The securitized share of subprime mortgages (i.e., those passed to third-party investors via MBS) increased from 54% in 2001, to 75% in 2006. (3) American homeowners, consumers, and corporations owed roughly $25 trillion during 2008. American banks retained about $8 trillion of that total directed as traditional mortgage loans. Bondholders and other traditional lenders provided another $7 trillion. The remaining $10 trillion came from securitization markets. The securitization markets started to close down in the spring of 2007 and nearly shut-down in the fall of 2008. More than a third of the private credit markets thus became unavailable as a source of funds. (4)(5) In February 2009, Ben Bernanke stated that securitization markets remained effectively shut, with the exception of conforming mortgages, which could be sold to Fannie Mae and Freddie Mac. (6)

11. A more direct connection between securitization and the subprime crisis relates to a fundamental fault in the way that underwriters, rating agencies and investors modeled the correlation of risks among loans in securitization pools. Correlation modeling-determining how the default risk of one loan in a pool is statistically related to the default risk for other loans-was based on a "Gaussian copula" technique developed by statistician David X. Li. This technique, widely adopted as a means of evaluating the risk associated with securitization transactions, used what turned out to be an overly simplistic approach to correlation. Unfortunately, the flaws in this technique did not become apparent to market participants until after many hundreds of billions of dollars of ABS and CDOs backed by subprime loans had been rated and sold. By the time investors stopped buying subprime-backed securities, which halted the ability of mortgage originators to extend subprime loans; the effects of the crisis were already beginning to emerge. (7)

12. Nobel laureate Dr. A. Michael Spence wrote: "Financial innovation, intended to redistribute and reduce risk, appears mainly to have hidden it from view. An important challenge going forward is to better understand these dynamics as the analytical underpinning of an early warning system with respect to financial instability." (8)

13. Both government failed regulation and deregulation contributed to this crisis. In testimony before Congress both the Securities and Exchange Commission (SEC) and

COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

4

Alan Greenspan conceded failure in allowing the self-regulation of investment banks.(9)(10)

## STATEMENT OF FACTS

14. At all relevant times, defendants, as a result of the control exercised over plaintiff's brokerage account, had a fiduciary duty and standard of care to plaintiff in all of their transactions with and for the plaintiff.

15. At all relevant times, defendants had the duty not to use or employ in connection with the purchase and sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of the Rules and Regulations promulgated by the Securities & Exchange Commission as necessary or appropriate in the public interest or for the protection of investors.

16. At all relevant times, defendants had the duty under the statutes, rules, and regulations cited above to use due diligence, to have learned the essential facts relative to plaintiff and to operate plaintiff's brokerage account in a fashion that would not cause an excessive trading or selling or purchasing securities without regard to plaintiff's situation and instructions.

17. At all relevant times, defendants had the common-law fiduciary duty, as well as the duty under the statues, rules, and regulations cited above, to recommend to plaintiff and to sell or purchase for plaintiff only those securities that they had reasonable grounds for believing were suitable for plaintiff on the basis of the facts disclosed by plaintiff to defendant regarding MARILOU SAMSON and her financial situation and needs. Defendant also had the common-law fiduciary duty to have had reasonable grounds to believe that any sale or purchase of securities made by defendants for plaintiff's account was suitable for plaintiff on the basis of information furnished by plaintiff to defendants after reasonable inquiry concerning plaintiff's investment objectives, financial situation, needs and any other information known to defendants.

18. On or about July 26th, 2005 Plaintiff obtained a certain line of credit a "Mortgage" from the defendant(s). This allegation supports an element of this cause of action, in that the transaction and account number was made in connection with a public offering.

19. On or about July 26th, 2005 while Plaintiff obtained a certain line of credit from defendant. However, defendants' untruth or omissions of which the plaintiff did not know at the time of the offer or sale.

20. On or about July 26th, 2005 Plaintiff after the creation of the account by the use of any means of interstate commerce of the mails, without a security agreement between the issuer.

21. On or about August 6, 2003 defendants purchased for plaintiff's account:

| NAME OF STOCK | NUMBER OF SHARES | PRICE | |
|---|---|---|---|
| *FIDELITY INVESTMENTS* | *UNKNOWN AQUIRED* | *$_____* | *Per* |
| *PORTFOLIO* | | | |
| *CUSIP#:_____N/A_____* | *FUND # N/A* | */SYMBOL= N/A* | |

22. During the period described above, the defendants wrongfully exercised control and dominion over plaintiff's brokerage account in violation of express conditions given to defendants at the time that the account was opened. In particular, the defendants executed multiple separate transactions during this period.

23. By use of means and instrumentalities of interstate commerce and of the mails, and the facilities of National securities Exchanges, defendants employed a device, scheme, and artifice to defraud plaintiff, and defendants engaged in a practice and course of conduct that operated fraud on plaintiff in connection with the purchase and sale of securities. Among other things, defendants wrongfully manipulated plaintiff's account with excessive sell and buy orders in a manner disproportionate to its size, character, and the objectives and instructions of plaintiff, bought and sold securities within short periods of time, switched securities from one to another without any investment justification other than to generate brokerage commissions for defendants' profit, executed transactions in violation of plaintiff's specific instructions, continuously maintained plaintiff's account at maximum or near maximum allowable margin, thus endangering plaintiff's investments

in any declining market, and used plaintiff's account in margin transactions to obtain maximum commissions on executed orders.

24. The actions of Defendants were not suitable to plaintiffs purchasing objectives, financial situation, and needs and were in violation of plaintiff's express instructions, the anti-fraud provisions of the statutes, rules, and regulations cited above.

25. In connection with the transactions described above, defendants failed in their fiduciary duty to plaintiff.

26. On or About July 26th, 2005 ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. sold to Plaintiff an undisclosed number of shares of stock in a Fidelity Investments for an unknown price, plus commission and other fees.

27. Prior to Plaintiff discovering that Defendant had committed a conversion of a security instrument, Plaintiff received from a secure source a detailed report thereof an account being publicly trading and illegally withheld from Plaintiff.

28. Any written prospectus covering the shares offered and sold to Plaintiff failed to disclose that:

    a.  ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. was very profitable and business was continuing to expand while it concealed the existence of an account, in the Plaintiff's possession with an unknown value as of the date of this complaint.

    b.  ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. encumbered the said fund and had accounts receivable of in excess of accounts payable and other debts totaling $576,000.00 while failing to prove ownership.

29. Plaintiff still owns the subject shares of the Fidelity Investment Fund.

30. Defendant directly, by the use of a means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, intentionally devised, and schemed to artifice to defraud.

COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

31. Defendant engaged in the act and practice during the ordinary course of business which operated fraud and deceit upon Plaintiff in connection with the purchase or sale of any security which violates *17 C.F.R. §240.10b-5 (1997)* also *See U.S. v. O'Hagan, 117 S. Ct. 2199, 2207, 138 L. Ed. 2d 724 (U.S. 1997)* the private right of action under section *10(b) and Rule 10b-5.*

### *FRAUD ON THE MARKET THEORY*

32. In *Basic*, supra note 2, the Supreme Court approving using the "fraud on the market" theory in federal securities cases. Quoting from *Peil v. Speiser, 806 F.2d 1154, 1160-1161 (3rd Cir. 1986)*, it observed:

> **"The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.....Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentation."** *See* generally *Fischel, Use of Modern Finance Theory in Securities Fraud Cases, 38 Bus. Law. 1 (1982) also See Gilson and Kraakman, The Mechanics of Market Efficiency, 70 Va. L. Rev. 549 (1984), See Kaufman v. I-Stat Corporation, 754 A.2d 1188 (N.J. 2000).*

33. "Failure of the Plaintiff to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent." *See Seeger v. Odell, 115 P.2d 977, 980 (Cal. 1941)*, In *Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 528 (7th Cir. 1985)* explained the rule in holding that the failure of a trustee to investigate did not relieve the Defendant of liability for securities fraud.

**"Securities law seeks to impose on issuers duties to disclose, the better to obviate the need for buyers to investigate. The buyer's investigation of things already known to the seller is a wasteful duplication of effort. If the securities laws worked perfectly there would be little need for investigation; sellers would disclose to the buyer and the market the information necessary for informed trading. Because some frauds**

will not be caught, and because people cannot interpret information flawlessly, this mechanism cannot work perfectly." "This failure makes investigations by investors necessary and creates incentives for sellers to hire certifiers (such as auditors and investment bankers) to verify sellers' statements. But such investigations and other devices are distinctly second-best solutions to legal and practical problems, and we will not approach of investigation on pain of losing the protection of the principal legal safeguard, the rule against fraud." *See Edgington v. Fitzmaurice 29 Ch. 459 (1885).*

34. Beginning on or about July 25th, 2005 and at various other times thereafter, Defendants ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. met, joined together, planned, and conspired to transfer and conceal assets of for the purpose of rendering EVERGREEN LENDING, INC. insolvent and unable to pay his creditors, including Plaintiff, by creating fictitious debts owed by ONE WEST BANK and JP MORGAN CHASE by making electronic payments and transfers of tangible assets to JOHN DOE TRUST in purported payment of such debts.

35. All of the named Defendants agreed or understood that the purpose of their meetings and agreements was as described in Paragraph 34, understood that both their purpose and their methods of achieving this purpose were unlawful and would result in injury to Plaintiff and others, and agreed and understood that each would act in concert with the others to achieve this purpose.

36. Beginning on or about July 26th, 2005 and continuing until the present time, and in furtherance of the conspiracy described in Paragraph 34, Defendant, ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S., has issued checks in the amount of at least $576, 000.00 written upon EVERGREEN LENDING, INC. accounts, and transferred business inventory valued at not less than $576,000.00 to themselves and to ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S., have transferred, concealed, and dissipated the

aforementioned funds and assets as they have received them, thus making it impossible or prohibitively expensive to trace and recover them. Defendant, EVERGREEN LENDING, INC. presently claims to be insolvent and unable to satisfy its debts, including those owed to Plaintiff.

37. Defendants undertook the acts described in Paragraph 34 with malice and intent to injure Plaintiff, among others.

38. Defendant, ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. undertook the acts described in Paragraph 34 for their unlawful personal gain, and did so neither for the benefit of, nor while acting in the role of lawful agent for, EVERGREEN LENDING, INC..

39. The acts described in Paragraph 34 were both unlawful and tortious, constituting conversion of corporate assets and the unlawful conveyance of property in defraud of creditors.

40. As a result of the acts described in Paragraph 34, Defendant, EVERGREEN LENDING, INC., has been rendered insolvent and unable to pay its debts. Plaintiff has consequently been unable to satisfy the judgment against Defendants described in Paragraph 3 or to otherwise recover upon the debts lawfully owed by Defendant. Plaintiff has incurred expenses in the amount of $15,000.00 in attempting to collect such debt and has suffered further loss in the amount of $576,000.00 as a result of the loss of the use of such funds. Plaintiff has thereby incurred pecuniary losses in the amount of $48,000.00.

41. Unless prevented by appropriate injunctive measures, Defendants will continue to inflict injury upon Plaintiff by continuing to conceal assets ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. and engaging in various deceptive measures intended to prevent discovery and recovery of such assets by lawful creditors of ONE WEST BANK.

## COUNT I
## BANKING ACT OF 1933
### (Glass-Steagall Act Request for Reinstatement Repealed Parts)

42. Plaintiff repeats each and every allegation contained in Paragraph 1 through 41, as though fully set forth here.

43. Defendants at any time mentioned never disclosed its underwriting process associated with the corporate securities or disclose to the Plaintiff its incorporated affiliates i.e. 'private investment banks".

44. This Act provides strict policies preventing investment banking activities of commercial banks and forces them to withdraw completely from important segments of the investment banking business.

45. The legislative intend of this Act was that it would prevent securities affiliates from over extending themselves in investing and trading in speculative securities and related markets, which was intended to deter reckless behavior which leads to economic disaster.

## COUNT II
### SECURITIES FRAUD UNDER 15 U.S.C. § 6801 (The Gramm-Leach-Bliley Act)

46. Plaintiff repeats each and every allegation contained in Paragraph 15 and 27 specifically, as though fully set forth here.

47. Defendants failed to adhere to The Safeguard Rule which require plans to "protect clients", nonpublic information.

48. Defendants have not denoted at least 1. One employee to manage the safeguards 2. Constructing a "risk management" on each department handling nonpublic information 3. Develop, monitor, and test a program to secure the information 4. Change the safeguard as needed with the changes in how information is collected, stored, and used.

49. Defendant is obligated under this act and is forced to take a closer look at how they manage private data and to do a risk analysis on their current process.

50. Defendant manipulated and deceptively devised and or contrivance in contravention of such rules and regulations as the Commission set forth appropriately in the best interest of the public and for the protection of investor, also see, section *206B of the Gramm-Leach-Bliley Act.*

COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

11

51. At all times mentioned Defendants did not provide or disclose to the Plaintiff the right in which a privacy notice gives the consumer a right to "opt out", Plaintiff did not enjoy this inherent right.

## COUNT III
### SECURITIES FRAUD UNDER SECURITIES EXCHANGE ACT OF 1934 § 10(b)

52. Plaintiff repeats each and every allegation contained in Paragraphs 1 through 41, as though fully set forth here.

53. Defendants in the ordinary course of business presented a material omission or misstatement in a proxy statement which is linked to the original transaction regarding the loan which was in turn converted to an investment account and Defendants such actions has resulted in economic harm to the Plaintiff.

54. As a result of the actions of defendants, plaintiff has been deprived of the specific securities that plaintiff wishes to retain, as set forth above.

55. The transaction in dispute included an untrue statement of material fact or omitting a material fact; *15 U.S.C. § 77q (a) (3)* engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

56. *Securities Regulation 60.28(4)* cites, an insider in possession of material non-public information is prohibited by Federal Securities Exchange laws from trading on the information unless he makes public disclosure.

57. Defendants acted with scienter by way of their reckless business practices as a result of the investment trading associated with the loan, required a document to be filed with the Securities and Exchange Commission, which Defendants failed to produce, Plaintiff content on the prima facia evidence that the registrations statement does not exist.

## COUNT IV
### VIOLATIONS UNDER THE TRUST INDENTURE ACT OF 1939

58. Plaintiff repeats each and every allegation contained specifically in Paragraphs 6, 14, 16, 17, 22, 24, 25.As though fully set forth here.

59. Defendant engaged in the trading and selling of the Plaintiffs note and sold it and made a public offering without offering a trust indenture which conformed to any statutory provision.

COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

60. The Act provides protection to investors by way of a trust indenture of its faithful duties in behalf of the purchasers of the securities.

61. Trustees or in other words fiduciaries are held to high standards of conduct under this Act, where the Defendants fall short.

62. Also this Act requires trustees to be a corporation with minimal combined capital and surplus, which is contrary to the Defendants actual and current situation.

63. Defendants at all times mentioned have produced reports and notices to the security holder the Plaintiff.

## COUNT V
## SECURITIES FRAUD UNDER SECURITIES EXCHANGE ACT OF 1934 § 12

64. Plaintiff repeats each and every allegation contained in Paragraphs 1 through 41 as though fully set forth here.

65. This cause arises from a connection with a public offering *See In re Syntex Corp. Securities Litigation, 855 F. Supp. 1086, 1098 (N.D. Cal 1994), aff'd 95 F. 3d 922 (9th Cir. 1996).*

66. Plaintiff did not consent or provide and application as set forth in *Sec. 12 (b)* of the Securities Exchange Act of 1934.

67. As a result of the actions of the defendants in purchasing the securities described above, plaintiff has had added to MARILOU SAMSON her account securities that she did not wish to own, which have declined substantially in price since the purchase by defendants, which have resulted in margin calls from defendants to post additional margin, threats of sale by defendants for failure to post such margin, and sale of some of the securities by defendants.

68. It was the Defendants that were obligated to provide the terms, position, rights and privileges of different classes of securities; furthermore, materials and contracts, balance sheets for at least (3) fiscal years; profit and loss statements, and further financial statements which the Commission may deem necessary or appropriate for the protection of investors.

69. Defendants had a "duty of care" to the Plaintiff and willfully neglected to exercise that duty.

COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

13

## COUNT VI
### CIVIL CONSPIRACY UNDER 18 U.S.C. § 371

70. Plaintiff incorporates by reference the factual allegations contained in Paragraphs 34 through 41.

71. The factual misrepresentation and omission set forth in paragraphs 34-41 were material, in that there is a "substantial likelihood" that the Plaintiff would have considered the misrepresentation and omitted facts important in deciding whether to enter into the aforementioned agreement.

72. At the time, ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. induced Plaintiff to purchase the subject shares of the said Fidelity Investments account, Plaintiff did not know that the material representations set forth in Paragraphs 34-41 were true or that the written prospectus or representation made to Plaintiff by Defendant regarding the fund existed by Defendant failing to disclose the material information set forth in Paragraphs 34-41.

73. Defendant and its officers, directors, agents and assigns conspired either to commit the offense against the Plaintiff and the United States by doing a lawful act by unlawful means, by doing the above mentioned overt act in pursuance of the conspiracy, and damages the Plaintiff as a result of the acts done in furtherance of the conspiracy to defraud, also see *Pub.L.103-322, 108 Stat., United States v. Walter, 1923, 44 S. Ct. 10, 263 U.S. 15, 68 L. Ed. 137.*

## COUNT VII
### RESCISSION

74. Plaintiff entered into a Deed of Trust transaction with the Defendants which has raised questions as to the financial practices and effect of the existing documents.

75. The parties closed on the Deed of Trust July 25th, 2005.

76. The existence of fraud, mutual mistake, false representations, impossibility of performance, or other grounds are appropriate for rescission or cancellation;

77. Plaintiff has rescinded the contract and notified the other party to the contract of such rescission;

78. Plaintiff has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible;

79. Lastly, that the moving party has no adequate remedy at law.

### COUNT VIII
### SCIENTER (INTENT TO MISLEAD)

80. Plaintiff incorporates by reference the factual allegations contained in Paragraph 17 through 19.

81. At all relevant times mentioned in the complaint the Defendants at no time mentioned the truth as to the securitized transaction which took place on Wall Street, then further alleged that the original "Note" was destroyed or was lost or stolen.

82. Plaintiff has repeatedly in the past requested for verification of a debt which was subject to collection, when in fact was contrary, therefore, misrepresented as a debt and not as a security which was intended to deceive the Plaintiff.

83. Plaintiff has made efforts to mitigate the harm caused, when the Defendants committed misrepresentation, therefore, damages may be recovered, for failing to offset the account by liquidating the Fidelity Account.

84. During the intercourse of the transaction Defendants recklessly provided covenants in their "Mortgages" which were designed to mislead consumers by stating the "Note" may be sold to multiple lenders and services multiple times, however, failed to specifically state how many times it was to be transferred and to whom; the contract in dispute lacks the specificity as to any association with Wall Street.

85. Defendants "reckless" behavior is unfavorable to the Plaintiff and to his detriment upon which he relied.

86. Defendant's reckless actions and dilatory conduct also conflict with state and federal usury laws, as well as, Fair Debt Collection Practices.

### PRAYER

Plaintiff requests judgment against defendants, jointly and severally:

A. For Rescissionary damages in the sum of $576,000.00 plus such further sums as damages as may in the further, pending the trial of this action, occur;

B. For prejudgment interests as provided by law;

COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934– CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

C. For punitive or exemplary damages in an amount no less than $25,000.00. Against defendant ONE WEST BANK, AURORA LOAN SERVICES, L.L.C., JP MORGAN CHASE and INDYMAC MORTGAGE SERVICES, EVERGREEN LENDING, INC. and M.E.R.S. and in an amount no less than $15,000.00 against the above mentioned parties;

D. For reasonable attorney's fees;

E. For cost of suit; and

F. For any and all other further relief may be proper.

Date: 10/25/2010

Respectfully Submitted,

Marilou: Samson, Authorized Agent, Trustee
2574 31st Avenue, Non-Domestic
San Francisco, California [94116]
Plaintiff, In Pro per
415-902-4910

1

## DEMAND FOR JURY TRIAL

2

   Plaintiff moves this court pursuant to Fed.R.Civ.P. Rule 38 *"Jury Trial of Right"*

3

and thereby demand a Jury Trial. The undersigned certifies that a copy hereof has been furnished

4

to the parties listed in the Certificate of Service.

5

6

By: _____

7

   Marilou: Samson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

17

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by U.S. Mail, Hand Delivery, and Process Server to the below mentioned on this _____, day of _____, 2010.

AURORA LOAN SERVICES, L.L.C.
2617 COLLEGE PARK
SCOTTSBLUFF, NEBRASKA 69363-1706

AURORA LOAN SERVICES, L.L.C.
10350 PARK MEADOWS DRIVE
LITTLETON, CO. 80124

EVERGREEN LENDING, INC.
10005 MUIRLANDS BLVD. SUITE G.
IRVINE, CA. 92618

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
c/o ELECTRONIC DATA SERVICES, L.L.C.
3300 SW 34TH AVENUE
OCALA, FL. 34474

ONEWEST BANK
6900 BEATRICE DR
KALAMAZOO MI 49009

CHASE BANK U.S.A.
800 BROOKSEDGE BLVD.
WESTERVILLE, OH 43081

FMR, L.L.C. FIDELITY INVESTMENTS
82 DEVONSHIRE STREET
BOSTON, MA. 02109-3605

SEC DIVISION OF ENFORCEMENT
100 F STREET
N.E. WASHINGTON, D.C. 20549

By: _____

Marilou: Samson

COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

1

## **VERIFICATION**

2

3    STATE OF CALIFORNIA

4    COUNTY OF _____

5        BEFORE ME, the undersigned authority, on this day personally appeared, Marilou:

6    Samson, who under oath stated the she is the Plaintiff on whose behalf the foregoing Complaint

7    is filed, that she is legally competent to make this Verification, which is based on his personal

8    knowledge, and that the factual statements contained in Paragraphs 1-86 of the foregoing

     Complaint are true and correct.

9                                          By: _____

10                                             Marilou: Samson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   COMPLAINT UNDER SECURITIES EXCHANGE ACT OF 1934- CHURNING OF ACCOUNT AND RELATED COUNTS JURY DEMAND

                                            19

## CALIFORNIA JURAT WITH AFFIANT STATEMENT

State of California

County of _San Francisco_ } ss.

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____

2 _____

3 _____

4 _____

5 _____

6 _X_Mee D Sann_____     _____
   Signature of Document Signer No. 1            Signature of Document Signer No. 2 (if any)

**KIMBA CHIU**
**COMM. # 1850960**
NOTARY PUBLIC-CALIFORNIA
CITY AND COUNTY OF SAN FRANCISCO
MY COMM. EXP. MAY 28, 2013

Subscribed and sworn to (or affirmed) before me on this

_25th_ day of _October_, _2010_, by
   Date              Month              Year

(1) _Marllon Sumson_ ,
                  Name of Signer

☐ Personally known to me
☑ Proved to me on the basis of satisfactory evidence
   to be the person who appeared before me (.) (,)
                  (and

(2)_____ ,
                  Name of Signer

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
   to be the person who appeared before me.)

_____
                  Signature of Notary Public

Place Notary Seal Above

─────── *OPTIONAL* ───────

*Though the information below is not required by law, it may prove*
*valuable to persons relying on the document and could prevent*
*fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document:_____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

©2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

# FOOTNOTES

(1) Lewis, Holden (18 April 2007). "Moral hazard' helps shape mortgage mess" Bankrate.com

(2) "Originate-to-Distribute" model and the subprime mortgage crisis http://papers.ssrn.com

(3) Demyanyk, Yuliya; Van Hemert, Otto (19 August 2008) "Understanding the Subprime Mortgage Crisis". Working Paper Series. Social Science Electronic Publishing

(4) "Nicole Gelinas (1 January 2009) "Can the Fed's Uncrunch Credit?" City-journal.org

(5) Brookings Institute- U.S. Financial and Economic Crisis June 2009 PDF Page 14 http://www.brookings.edu/papers/2009/0615_economic_crisis_bailey_elliott.aspx

(6) http://www.federalreserve.gov/newsevents/testimony/bernanke20090224a.htm

(7) Salmon, Felix (http://www.felixsalmon.com) (2009-02-23) "Recipe for Disaster: The Formula that Killed Wall Street"

(8) "Lessons from the Crisis" (http://www.pimco.com) US House of Representatives Committee on Government Oversight and reform (22 October 2008) http://oversight.house.gov

(9) Labaton, Stephen (2008-09-27). "SEC Concedes Oversight Flaws" (http://www.nytimes.com/2008/09/27sec.html?em.

(10) Labaton, Stephen (2008-10-03). "The Reckoning" (http://www.nytimes.com/2008/10/03/business/03sec/html?em